## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civ. No. DLB-22-2948** |
| | * | |
| **UNITED THERAPEUTICS CORPORATION,** | * | |
| | * | |
| **Defendant.** | * | |

### MEMORANDUM OPINION

United Healthcare Services, Inc. ("UHC"), a health insurance company, claims that United Therapeutics Corporation ("UT"), a pharmaceutical manufacturer, unlawfully covered patients' copays for UT drugs. By enabling more patients to afford the drugs, UT's illicit subsidies allegedly led more of UHC's insureds to use them. That meant UHC had to pay more claims for the drugs than the insurer would have otherwise. So UHC filed this case against UT for violating the civil Racketeer Influenced & Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, Minnesota common law, and the laws of a dozen states. ECF 1. Now, UT moves to dismiss the complaint for failure to state a claim. ECF 30. The motion is fully briefed. ECF 30-1, 35, 36. No hearing is necessary. *See* Loc. R. 105.6. For the reasons below, the Court grants UT's motion to dismiss.

## I.      Background

Pulmonary Arterial Hypertension ("PAH") is a chronic, progressive, life-threatening cardiac condition that can result in heart failure. ECF 1, ¶¶ 14–15, 17. Fortunately, PAH is rare. *Id.* ¶ 14. Unfortunately, PAH treatment is expensive. *Id.* ¶ 1. For some patients, the annual cost of a single drug is about $172,000. *Id.* ¶ 22. UT is a pharmaceutical company that manufactures drugs used to treat PAH. *Id.* ¶¶ 1, 18–36.

Patient Assistance Programs ("PAPs") are nonprofit charitable endeavors that help cover patients' out-of-pocket expenses for medication. *Id.* ¶¶ 45–50. PAPs may enable some patients to obtain vital drugs they could not afford otherwise. *Id.* But by reducing patients' sensitivity to drug prices, PAPs also may lead patients to take more expensive medications than they need, lock patients into particular drugs, raise prices, and distort the pharmaceutical market. *Id.* ¶¶ 45–54. One PAP, Caring Voice Coalition ("CVC"), helps patients with the costs of PAH treatment. *Id.* ¶¶ 4, 6, 82, 110–11, 117.

The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, prohibits drug manufacturers from waiving or paying the cost-sharing obligations of Medicare beneficiaries—that is, the amount beneficiaries would have to pay out-of-pocket for their medications. *Id.* ¶¶ 86, 90, 119. Nevertheless, the U.S. Department of Health and Human Services Office of Inspector General ("OIG") maintains that drug manufacturers may donate to PAPs without violating the AKS. *Id.* ¶ 92. According to the OIG, a donation is permissible if the PAP is a *bona fide* charity independent of the drug manufacturer, the PAP assists beneficiaries without regard to the drugs they choose, the PAP distributes assistance on the basis of objective criteria of need, the manufacturer and the PAP do not share data that would enable the manufacturer to link its donations to beneficiaries' use of its products, and the donations are not earmarked for specific drugs or narrow categories of disease. *Id.* ¶ 102.

From 2010 to 2017, UT contributed millions of dollars a year to CVC. *Id.* ¶ 111. But UT and CVC allegedly did not comply with these legal requirements. *Id.* ¶ 112. UT gathered a variety of data from CVC, like how many UT patients the organization helped and how much CVC had given them. *Id.* ¶¶ 112–14. With that data in hand, UT tailored its transfers to CVC so that the funds would be used solely to cover the out-of-pocket costs of PAH patients filling prescriptions

for UT's PAH drugs. *Id.* ¶¶ 115–17. In short, UT used CVC to steer money to PAH patients taking UT drugs—eliminating their cost-sharing obligations. *Id.* ¶¶ 112, 121–22. To increase uptake, UT developed what it dubbed the Access Solutions and Support Team ("ASSIST"), which promoted the availability of CVC funding to patients and doctors, facilitated the gathering of patient information by UT, referred patients to CVC for assistance, ensured that CVC provided these patients funds UT had donated to CVC, and helped doctors with the submission of claims and the appeals of denied claims. *Id.* ¶¶ 130–37.

In these years, UT's sales of its PAH drugs increased. *Id.* ¶ 140. UT raised the price of one of its PAH drugs, Remodulin. *Id.* ¶ 139. Even though UT raised the price, its sales increased too. *Id.* At least in part on the strength of increased PAH drug sales and higher Remodulin prices, UT's earnings increased substantially: Annual revenue more than tripled from about $350 million to $1.2 billion and profit margins increased from negative 17 percent to positive 34.5 percent. *Id.* ¶¶ 141–42.

UHC is a health insurance provider. *Id.* ¶ 55. UHC has a significant role in Medicare, administering Medicare Part C and Part D plans. *Id.* ¶ 58. Medicare Part C coverage, also known as Medicare Advantage, primarily covers hospital and clinical care, but often covers prescription drugs as well. *Id.* ¶ 60. It is administered by private health insurers like UHC pursuant to contracts with the federal government. *Id.* Medicare Part D is a prescription drug coverage program and is administered exclusively by private insurers like UHC. *Id.* ¶ 61.

Some of the PAH patients whose costs UT's scheme covered were Medicare Part C and Part D beneficiaries enrolled in UHC plans. *Id.* ¶ 111. UHC alleges that by effectively eliminating these patients' cost-sharing obligations, UT caused UHC to receive and pay out more claims for UT's PAH drugs, at higher prices, than the insurer would have covered otherwise. *Id.* ¶ 123.

Overall, UHC alleges that it paid "many millions of dollars" for UT PAH drugs during the course of the scheme. *Id.* ¶ 169. By UHC's reckoning, "a significant portion of those prescriptions were not reimbursable because they were tainted by the illegal kickbacks funded through CVC." *Id.* ¶ 171.

UHC also alleges that throughout the scheme, UT falsely certified that it was in compliance with federal and state law. *Id.* ¶ 146. Any entity that subcontracts with a Medicare Part C or Part D Sponsor like UHC must comply with federal laws and regulations, including the AKS. *Id.* ¶ 147. According to UHC, "[d]rug manufacturers that elect to participate in Medicare Part D therefore certify their compliance with the Anti-Kickback Statute." *Id.* ¶ 148. Once, UT even made a comparable representation directly to UHC. *Id.* ¶¶ 150, 187. In a rebate agreement between the parties, UT declared that it had and would "take under consideration" the OIG Compliance Program Guidance for Pharmaceutical Manufacturers and "comply with applicable federal and state statutes, laws, and regulations, including Part D Rules, with respect to the performance of its duties and obligations under this agreement." *Id.* ¶ 187. UHC included UT's drugs on its formulary—that is, put them on the list of drugs it would cover at all—in reliance on UT's certifications that it complied with federal law. *Id.* ¶ 149.

UT also allegedly induced others to unknowingly falsely certify that they were in compliance with federal law. Federal regulations require pharmacies that dispense drugs to Medicare Part C or Part D beneficiaries to certify that the records they submit with each claim are accurate. *Id.* ¶ 153. Any record that results from a violation of the AKS is a false claim under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq. Id.* When pharmacies sought reimbursement from UHC for prescriptions for UT PAH drugs they filled for UHC Medicare beneficiaries whose

copays were covered by CVC, these pharmacies made such certifications without knowing that they were false because they resulted from UT's violations of the AKS. *Id.* ¶¶ 153–54.

    In late 2017, the federal government exposed the arrangement between UT and CVC. First, on November 28, 2017, the OIG rescinded an advisory opinion it had issued at CVC's request in 2006. *Id.* ¶ 165. The OIG rescinded the opinion on the ground that the Office had learned that CVC provided patient data to at least one donor that would enable the donor to correlate its donations with subsidized prescriptions for its products and that CVC had allowed donors to influence its activities. *Id.* ¶¶ 166–67.

    Second, on December 20, 2017, the U.S. Department of Justice ("DOJ") announced that after an investigation into UT and CVC, it had reached a settlement agreement with UT for alleged violations of the FCA. *Id.* ¶ 156, 160. In the settlement agreement, DOJ described how UT had used CVC as a pass-through to eliminate the cost-sharing obligations of thousands of Medicare beneficiaries who took UT's PAH drugs, thereby inducing them to purchase the medications without regard to price. *Id.* ¶ 158. "UT's payments to the [CVC] were not charity for PAH patients generally," DOJ alleged, "but rather were a way to funnel money to patients taking UT drugs." *Id.* ¶ 160 (quoting *Drug Maker United Therapeutics Agrees to Pay $210 Million to Resolve False Claims Act Liability for Paying Kickbacks*, United States Department of Justice (Dec. 20, 2017), https://www.justice.gov/opa/pr/drug-maker-united-therapeutics-agrees-pay-210-million-resolve-false-claims-act-liability). UT agreed to pay $210 million to the federal government and entered into a Corporate Integrity Agreement requiring the manufacturer to end its unlawful relationship with CVC and enact measures to prevent comparable misconduct in the future. *Id.* ¶¶ 156, 162. According to the settlement agreement, UT's illegal coordination with CVC ran from February 2010 to January 2014. Settlement Agreement Between United States and United Therapeutics,

U.S. Dep't of Justice (Dec. 19, 2017), https://www.justice.gov/usao-ma/press-release/file/1019336/download.

Subsequently, UT and UHC entered into an agreement to toll all claims effective December 17, 2020. ECF 35, at 20 n.3 (correcting ECF 1, ¶ 176). After months of settlement negotiations, that agreement expired on November 14, 2022. ECF 1, ¶ 176.

On November 15, 2022, UHC brought this case against UT. ECF 1. The complaint includes eight counts: fraudulent concealment under Minnesota law (Count I); fraud under Minnesota law (Count II); tortious interference with contract under Minnesota law (Count III); aiding and abetting tortious conduct under Minnesota law (Count IV); violation of the civil RICO statute, 18 U.S.C. § 1962(c) (Count V); conspiracy to violate the civil RICO statute, 18 U.S.C. § 1962(d) (Count VI); unjust enrichment (Count VII); and violations of the deceptive trade practices statutes of Arizona, California, Colorado, Florida, Illinois, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New York, and North Carolina (Count VIII). ECF 1, ¶¶ 177–253.

On March 3, 2023, UT moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. ECF 30. UHC opposed the motion. ECF 35. UT replied. ECF 36.

## II.   Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires the plaintiff to include in their complaint a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency of that statement. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); Fed. R. Civ. P. 12(b)(6). A court will deny a Rule 12(b)(6) motion if, but only if, the complaint contains sufficient factual allegations to "state a claim to relief that is plausible on its face." *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In ruling on

the motion, a court accepts the well-pleaded allegations as true, *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021), but "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses," *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). A complaint that merely recites the elements of the cause of action or couches legal conclusions as facts cannot overcome a Rule 12(b)(6) motion. *See Twombly*, 550 U.S. at 555; *Turner*, 930 F.3d at 644. In resolving a Rule 12(b)(6) motion, a court may consider "documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted); *see* Fed. R. Civ. P. 10(c).

When RICO allegations sound in fraud, the plaintiff must meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b). *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 586 (D. Md. 2014) ("[A]llegations of fraud—which Plaintiff raises in both her RICO and state law claims—are subject to a heightened pleading standard under Rule 9(b)."); *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 473 (D. Md. 2009) ("When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity, pursuant to Rule 9(b)."); *Ekstrom v. Cong. Bank*, No. ELH-20-1501, 2020 WL 6565251, at *19 (D. Md. Nov. 9, 2020) ("Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies."). Under Rule 9(b), the plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). These circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

## III.    Discussion

UHC's complaint includes three types of claims against UT: civil RICO claims, common law claims, and claims under the deceptive trade practices statutes of twelve states. All three types of claims will be dismissed.

### A.  Statute of Limitations

At the outset, UT argues that all of UHC's claims are barred by the applicable statutes of limitations. ECF 30-1, at 15–21. "The statute of limitations on private civil RICO claims is four years, beginning on the date the plaintiff 'discovered, or should have discovered, the injury.'" *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 476 (4th Cir. 2015) (quoting *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001)). "A party is on 'inquiry notice,' meaning that the party should have discovered the injury, when it 'has such knowledge as would put a reasonably prudent [party] on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based.'" *Layani v. Ouazana*, No. 20-420-SAG, 2022 WL 294286, at *6 (D. Md. Feb. 1, 2022) (quoting *Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1303 (4th Cir. 1993)). With the exception of the Michigan and Minnesota statutory claims, the statutes of limitations applicable to UHC's common law and state statutory claims are the same as the RICO claim or shorter. ECF 30-2, at 1–2 (collecting cases and statutes).[1] According

---

[1] UHC's common law claims are governed by Maryland's statutes of limitations, but each of its state statutory claims is governed by the statute of limitations that applies under the law of the respective state. "If a federal district court sitting in a diversity case is dealing with a question of law that is procedural in nature, the forum state's law applies." *Akinmeji v. Jos. A. Bank Clothiers, Inc.*, 399 F. Supp. 3d 466, 472 (D. Md. 2019) (citing *Sokolowski v. Flanzer*, 769 F.2d 975, 978 (4th Cir. 1985) (applying Maryland law)). "In this choice of law context, Maryland courts almost universally view issues pertaining to the statute of limitations as procedural, not substantive." *Id.* (citing *Turner v. Yamaha Motor Corp., U.S.A.*, 591 A.2d 886, 887 (Md. App. Ct. 1991); *Doughty v. Prettyman*, 148 A.2d 438, 440 (Md. 1959)). The sole exception is when the Maryland statute of limitations would extinguish a claim under another state's statutes. *Id.* "In such cases, Maryland courts apply the statute of limitations period of the foreign state's law." *Id.*

to UT, UHC should have discovered its potential claims on or by July 28, 2016. Yet the tolling agreement UHC executed with UT was not effective until December 17, 2020. So UT argues UHC's claims are time-barred.

At least at this stage of the litigation, the Court cannot endorse UT's conclusion that all of UHC's claims are time-barred. A court may grant a Rule 12(b)(6) motion to dismiss on the basis of an affirmative defense like the statute of limitations only if "if all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (cleaned up). Here, they do not. From the face of the complaint and the documents UT asks the Court to notice, it is not apparent that UHC could and should have discovered its injury until DOJ announced its settlement with UT in December 2017.

UT argues that UHC knew on or by July 28, 2016 to investigate its potential claims because by then the *New York Times* had reported on a federal investigation into the relationship between a different pharmaceutical company and a different PAP, other media outlets had reported on several federal subpoenas concerning other drug companies and other PAPs, UT had long disclosed that it donated to PAPs, and—perhaps most importantly—on July 28, 2016 UT disclosed that it had received a federal subpoena concerning "support of 501(c)(3) organizations that provide financial assistance to patients taking [its] medicines." ECF 30-1, at 16–17. Even if the Court were to take judicial notice of these materials for the purpose of determining what UHC might have heard by that date, *see KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021); *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013), they would not establish that UHC was on inquiry notice. None of the reporting mentioned UT or CVC, let alone UT's PAH drugs. And when UT disclosed the subpoena, UT did not disclose that it concerned CVC or UT's PAH drugs, nor did UT disclose any details about what DOJ sought or why. Even if

those revelations should have prompted UHC to look into the matter, it is far from clear that any UHC inquiry "would [have] reveal[ed] the facts on which [its] claim is ultimately based.'" *Layani*, 2022 WL 294286, at *6 (quoting *Caviness*, 983 F.2d at 1303). UT offers no account of how UHC could have unearthed what allegedly happened. Even DOJ seems to have required subpoenas to bring the alleged scheme to light. UT contends that because UHC has been able to identify some of the claims it paid out as a result of the alleged scheme, UHC could have done the same back then. ECF 30-1, at 18. The facts necessary to support that inference are hardly clear on the face of the complaint or the judicially noticeable documents. The Court cannot assume that what UHC has been able to discover *since* DOJ revealed UT's alleged unlawful conduct, UHC would have been able to discover *before* DOJ revealed that conduct.

The Court will not dismiss these claims as time-barred. The point is not that UHC certainly could not have investigated and discovered its injuries by July 28, 2016. The point is only that at this stage of the litigation, it is not sufficiently apparent that UHC could have done so to warrant the dismissal of its claims on statute of limitations grounds.

UHC's claims under the Michigan and Minnesota deceptive trade practices statutes pose a different question. The statutes of limitations on these claims expire six years from the date of the last act that gave rise to liability. *See* Mich. Comp. Laws § 445.911(9); *Laura v. DaimlerChrysler Corp.*, 711 N.W.2d 792, 793–94 (Mich. App. 2006); Minn. Stat. § 541.05(2); *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 876 (D. Minn. 2012). As UT reads the complaint, UHC "alleges no violation later than January 2014 (the final date the DOJ alleged CVC shared data with UT), which was more than six years before the tolling agreement." ECF 30-1, at 19. By contrast, UHC claims the complaint lists alleged violations through December 2017. ECF 35, at 21–22 (citing ECF 1, ¶¶ 7, 172; ECF 1-2). UT is right. Here are the relevant allegations:

> This misconduct caused [UHC's] Medicare Part C and D plans to pay tens of millions of dollars on tainted claims for UT's drugs, and to do so at wildly inflated prices, between 2010 and 2017.
>
> Because of the secretive nature of UT's arrangement with CVC, which was not made public until December of 2017, [UHC] does not yet know the full scope of the damage attributable to UT's illegal and tortious conduct.
>
> A representative sample of claims [UHC] has determined to have been tainted by UT's illegal scheme is attached hereto as Exhibit B. Specifically, [UHC] has (by its own investigation) determined that CVC paid the cost-sharing obligations associated with these claims.

ECF 1, ¶¶ 7, 172–73. Exhibit B is a table entitled, "UHC Members Whose Cost-Sharing Obligations Were Paid by Caring Voice Coalition." ECF 1-2, at 2. The main problem for UHC is that alleging that UHC covered claims for which CVC paid the insured's cost-sharing obligation is not the same as alleging that the insurer covered claims that arose from UT's unlawful conduct. ECF 1, ¶ 173. The former is not an allegation of an act giving rise to liability; only the latter is. Because UHC has alleged only the former, UHC has not plausibly alleged that UT's unlawful conduct continued past January 2014.[2] In consequence, UHC's Michigan and Minnesota statutory claims are barred by their respective statutes of limitations. These claims are dismissed.

## B.  RICO

UHC brings two civil RICO counts against UT: violation of the statute and conspiracy to violate the statute. UHC's RICO claims fail for three independent reasons, any one of which would

---

[2] In an appendix to its opposition, UHC contends that the Minnesota statutory claim is timely nevertheless because the statute of limitations is subject to equitable tolling pursuant to the doctrine of fraudulent concealment. ECF 35, at 53. "The doctrine of fraudulent concealment of a cause of action has long been used in Minnesota to toll the applicable statute of limitations." *Thunander*, 877 F. Supp. 2d at 867 (citing *Schmucking v. Mayo*, 235 N.W. 633 (Minn. 1931)). "The burden is on the plaintiff to establish the elements of fraudulent concealment." *Lamere v. St. Jude Med., Inc.*, 827 N.W.2d 782, 788 (Minn. Ct. App. 2013). As the Court discusses below in its evaluation of UHC's cause of action for fraudulent concealment, UHC has not carried its burden. Therefore, the statute of limitations is not equitably tolled.

result in dismissal: UHC has failed to satisfy the heightened pleading standard of Rule 9(b); UHC's claims are barred by the indirect purchaser rule; and UT's alleged conduct did not proximately cause UHC's injuries.

### a. Rule 9(b)

UHC's RICO claims fail to satisfy the pleading standard of Rule 9(b). "The RICO statute creates civil liability for those who engage in a 'pattern of racketeering activity.' The statute defines racketeering activity to include, among other acts, acts of mail and wire fraud." *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (quoting 18 U.S.C. §§ 1962, 1964). UHC alleges that UT engaged in mail and wire fraud: specifically, that UT falsely represented that it was in compliance with federal and state law, particularly the AKS, when it was not. In consequence, UHC must plead the acts of racketeering it alleges with the specificity required by Rule 9(b). *See Chambers*, 43 F. Supp. 3d at 586.

UHC has not pled any misrepresentation with the particularity Rule 9(b) demands. UHC appears to proffer two theories of UT's fraud: that UT falsely certified its compliance with the AKS, thereby inducing UHC to include UT's PAH drugs on its formulary, ECF 1, ¶¶ 146–49, and that UT "made, and deliberately caused pharmacies to unknowingly make," false certifications to UHC that each individual claim for a UT PAH drug was made in accordance with federal law, thereby inducing UHC to pay those claims, *id.* ¶¶ 151–54. Yet UHC does not share or detail any example of either type of misrepresentation. UHC does not illuminate what UT certified, when, where, or to whom, let alone how UT induced pharmacies to make false representations of their own, how any alleged misrepresentations reached UHC, or what role these misrepresentations played in UHC's decision-making about its formulary or individual claims.

Worse still, UHC's first theory is an inference unsupported by specific allegations. Drug manufacturers, UHC reports, must comply with federal law. *Id.* ¶ 147. "Drug manufacturers that elect to participate in Medicare Part D therefore certify their compliance with the Anti-Kickback Statute," UHC continues. *Id.* ¶ 148. The implicit conclusion is that as a drug manufacturer participating in Medicare Part D, UT must have certified its compliance with the AKS. But UHC does not specifically allege that. Instead, UHC proceeds immediately to the assertion that UHC "included UT's PAH drugs on its formulary (i.e., agreed to cover and pay for these drugs) in reliance on UT's certification of compliance with applicable federal laws." *Id.* ¶ 149. And even that allegation contains no detail at all—not when UHC added UT's PAH drugs to its formulary, not what assurances from UT UHC had read by that time, nor what role those assurances played in UHC's decision to cover those UT drugs. Sure, right before these paragraphs, UHC alleges that "UT made and caused to be made false representations and certifications to [UHC] of compliance with state and federal law." *Id.* ¶ 146. But that is a conclusory statement, not a detailed factual allegation.

The Third Circuit recently affirmed the dismissal under Rule 9(b) of RICO claims just like UHC's formulary allegations. *See Humana, Inc. v. Indivior, Inc.*, Nos. 21-2573 & 21-2574, 2022 WL 17718342, at *3–4 (3d Cir. Dec. 15, 2022). Much of what that court wrote applies here:

> [T]here is no specific allegation of injury or pattern other than the expense of the drug involved. The Insurers' complaints make only passing references to formularies. They fail to specify, for example: which of Defendants' misrepresentations Insurers relied on when they placed [the drug] on their formularies; to whom or by whom those misrepresentations were made; or when they were made. At most, the Insurers state the conclusory allegation that they "reasonably relied on [defendants'] statements and misrepresentations . . . and included [the drug] on [their] formularies."

> To comply with Rule 9(b), Insurers must at least describe, with particularity, how they were induced by Defendants. Instead, they merely claim that they were induced without pointing to which misrepresentations caused their induction. In

other words, under Rule 9(b), there is no indication which "circumstances constitut[ed] the fraud" they complain of. If this Court cannot say how defendants' fraud caused Insurers' injury, it cannot say that Fed. R. Civ. P. 9(b) was satisfied.

*Id.* at *4. So too here.

The closest UHC comes to satisfying Rule 9(b) is its allegation that UT made one of these misrepresentations directly to UHC in a rebate agreement between the parties. According to UHC,

> UT agreed that it "has and will take under consideration" the Office of the Inspector General ("OIG") Compliance Program Guidance for Pharmaceutical Manufacturers and that it would "comply with applicable federal and state statutes, laws, and regulations, including Part D Rules, with respect to the performance of its duties and obligations under this agreement."

ECF 1, ¶ 150. That is a start. But this allegation poses as many questions as it answers. When was this agreement made? What did this agreement concern? What is the complete text of the sentence or sentences UHC is quoting—let alone the context? "The unknowns swamp the knowns." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022). These details matter. Without any information about when the parties made this agreement, the Court cannot tell whether it even took place during the period when UHC alleges UT broke the law. Without any information about what this agreement concerned or what the passage or passages said, the Court cannot tell whether UHC is even alleging—much less plausibly alleging—that UT's apparent commitment to follow the law "with respect to the performance of its duties and obligations under this agreement" was fraudulent. *Id.* The rebate agreement allegation is not enough to satisfy Rule 9(b).

Perhaps aware that its complaint does not satisfy Rule 9(b), UHC argues that it does not have to. UHC is wrong about that. True, as UHC says, the Fourth Circuit has counseled that

> [a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.

*Harrison*, 176 F.3d at 784. But that advice hardly means that Rule 9(b) is optional. Even when citing and applying that guidance, the Fourth Circuit has underscored that "the particularity standard is steep" and the rule still "require[s] significant detail." *Nicholson*, 42 F.4th at 195–96. For that reason, the Fourth Circuit affirmed a dismissal where the plaintiff provided one example of a false claim but failed to detail who submitted the claim, to whom, and where. *Id.* In any event, the vagueness of the complaint on the crucial questions of when, how, and to whom UT made the allegedly false claims does not inspire confidence that UHC has "substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

UHC also points out that a single unpublished district court opinion states that "[d]espite the high standard demanded by the Rule 9(b) particularity requirement, in the context of RICO mail fraud the Court may also consider the interplay of the more liberal notice pleading standard of Rule 8." *WW, LLC v. Coffee Beanery, Ltd.*, No. WMN-05-3360, 2012 WL 3728184, at *10 (D. Md. Aug. 27, 2012). But that court was concerned with "the difficulty that arises in pleading a RICO suit against multiple defendants." *Id.* This case has only one defendant. Even setting that distinction aside, UHC's complaint contains much less detail about the alleged misrepresentations than the complaint that passed muster in *WW*. That complaint detailed the date the fraudulent statements were made, the document in which they were made, which statements were false, who sent them to whom, and how the fraud involved the mails. *Id.* at *11. There is no comparison.

Rule 9(b) requires UHC to plead its mail and wire fraud allegations in significant detail. UHC has not done so. As a result, UHC's civil RICO claims are dismissed because they do not comply with Rule 9(b).[3]

_____

[3] In passing, UHC also alleges that UT committed another type of predicate act: violation of the Travel Act, 18 U.S.C. § 1952. ECF 1, ¶ 225. However, UHC never identifies how UT allegedly

### b. Indirect Purchaser Rule

The indirect purchaser rule ("IPR") provides that only the direct purchaser of a good has statutory standing to bring a claim predicated on the purchase of the good. *See Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1520–21 (2019). Under the IPR, "indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue." *Id.* at 1520. "For example, if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Id.* at 1521. The underlying idea is that "indirect purchasers could not claim to be injured because direct purchasers had passed on illegal overcharges to them." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 320 (4th Cir. 2006).

The IPR originated with the federal antitrust statutes. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 213–14 (4th Cir. 2002) (reviewing the history of the IPR); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734–36 (1977) (establishing the IPR in its contemporary form). But most courts that have considered whether the IPR applies to civil RICO claims have held that it does. *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 546 F. Supp. 3d 1216, 1223 (S.D. Fla. 2021) (collecting cases). That includes all three U.S. Courts of Appeals that have ruled on the issue: the Third, Sixth, and Seventh Circuits. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004); *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985); *see also Humana, Inc. v. Biogen*, No. 21-11578-FDS, 2023 WL 2743307, at *1 (D. Mass. Mar. 31, 2023) ("Every circuit to have considered the issue has held that the rule also applies to civil RICO actions, and that indirect purchasers therefore do not have standing to assert RICO claims."). In recent cases very similar to this one, district courts in two

---

violated that statute. UT pressed UHC to explain in briefing. ECF 30-1, at 30. UHC did not elaborate. In the absence of any specific factual allegations that UT violated the Travel Act, this conclusory allegation fails under any pleading standard.

additional circuits—the First and Fourth—have held the same. *See Humana*, 2023 WL 2743307, at *13; *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, No. 3:22-cv-422-HEH, 2024 WL 37208, at *4 (E.D. Va. Jan. 3, 2024).

No binding Fourth Circuit precedent holds that the IPR applies to civil RICO claims. *See MSP Recovery Claims, Series LLC v. Lundbeck LLC*, No. 3:22-cv-422-HEH, 2023 WL 2637383, at *9 (E.D. Va. Mar. 24, 2023). But the Fourth Circuit has signaled that it does. In *NCNB National Bank of North Carolina v. Tiller*, the Fourth Circuit adopted the Seventh Circuit's holding that the IPR applies to civil RICO claims. 814 F.2d 931, 937 (4th Cir. 1987), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990).[4] In isolation, the Fourth Circuit's articulation of the rule might seem relatively elliptical: "An indirectly injured party should look to the recovery of the directly injured party, not the wrongdoer for relief. This principle applies to RICO cases." *Id.* (citing *Carter*, 777 F.2d at 1175–76). But the citation made the court's meaning crystal clear. In *Carter*, the Seventh Circuit had used those very words to express its holding that the IPR bars indirect purchasers from bringing civil RICO claims. *See Carter*, 777 F.2d at 1176. As the Seventh Circuit elaborated, at the pages the Fourth Circuit cited, the rule that "[t]he indirect purchaser recovers nothing, even if it bore the whole overcharge and even if the direct purchaser did not sue . . . should apply to RICO cases," "because the damages provision in § 1964(c) is practically verbatim the damages provision in the antitrust laws," *id.* at 1175–76.

Even if this Court did not have the benefit of these Fourth Circuit signals that the IPR applies to civil RICO claims, the Court would be persuaded that it does. "Congress modeled [the

---

[4] District courts in the Fourth Circuit continue to cite *NCNB* for this proposition even though the Fourth Circuit overruled it. *See Bhambhani v. Innovative Health Sols.*, No. 19-00355-LKG, 2022 WL 2133906, at *4 (D. Md. June 14, 2022); *Umphlett Lumber Co. v. Trident Sys., Inc.*, 878 F. Supp. 844, 847 (D.S.C. 1995).

civil RICO statute] on the civil-action provision of the federal antitrust laws." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267 (1992). The relevant language in the RICO statute is modeled on § 4 of the Clayton Act. *Id.* at 267–68. Section 4 of the Clayton Act is modeled on § 7 of the Sherman Act. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534 (1983). And courts read the Sherman Act to limit relief to parties whose injuries are at "the first step" from a violation of the statute because Congress intended to incorporate that limitation from the statute's common law antecedents. *Id.* at 529–34. As the Supreme Court observed in an early articulation of the IPR, relief for monopolistic pricing is limited to the first party who paid the unlawfully higher price—the party "that alone was in relation with" the monopolist. *See S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534 (1918). Because the RICO statute shares the language and lineage of these antitrust statutes, the Court consistently has found that the doctrinal restrictions on who may bring a claim under the antitrust laws also govern who may bring a claim under the civil RICO statute. *See Holmes*, 503 U.S. at 268; *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008); *Hemi Grp., LLC. v. City of New York*, 559 U.S. 1, 9 (2010). The Court's reasoning all but dictates that the IPR applies as well. *See McCarthy*, 80 F.3d at 855 ("antitrust standing principles apply equally to allegations of RICO violations"); *Humana*, 2023 WL 2743307, at *11 ("Put simply, if the indirect purchaser rule applies to claims under § 4 of the Clayton Act, it necessarily applies to civil RICO claims under § 1964(c)."). To hold that the antitrust statutes incorporate the IPR but the civil RICO statute does not would be to read the same language, with the same history, to mean two different things.

Grasping for a lifeline, UHC argues that the Third, Sixth, and Seventh Circuits have not adopted the IPR for civil RICO cases. ECF 35, at 27–29. UHC is, in a word, wrong. UHC asserts that the Third Circuit in *McCarthy* "did not go so far as to preclude any indirect purchaser from

asserting a RICO claim." ECF 35, at 28. It is hard to imagine how the Third Circuit could have been clearer:

> [A]ntitrust standing principles apply equally to allegations of RICO violations. The precepts taught by *Illinois Brick* and *Utilicorp* apply to RICO claims, thereby denying RICO standing to indirect victims. . . . Hence, the central and dispositive issue is whether plaintiffs are "direct purchasers." If so, they are entitled to pursue both their antitrust and RICO claims. If not, and insofar as damages are concerned, the district court properly granted summary judgment in favor of the defendants.

*McCarthy*, 80 F.3d at 855. UHC tries to make a similar spurious claim about the Sixth Circuit's decision in *Trollinger*, insisting that "[n]owhere in its opinion does the court adopt the indirect purchaser doctrine." ECF 35, at 27. That would be news to the Sixth Circuit and its district courts, which routinely cite *Trollinger* as the leading case on the IPR, *see In re Auto. Parts Antitrust Litig.*, 997 F.3d 677, 683 (6th Cir. 2021), and its applicability to RICO claims, *see, e.g.*, *Bledsoe v. FCA US LLC*, 4:16-CV-14024-TGB-RSW, 2023 WL 2619132, at *15 (E.D. Mich. Mar. 23, 2023); *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 678, 703–04 (E.D. Mich. 2022). UHC claims that because the Seventh Circuit's decision in *Carter* did not concern purchasers at all, the Seventh Circuit did not extend or could not have extended the IPR to RICO cases there. ECF 35, at 28. In reality, the Seventh Circuit simply adopted a *broader* version of the indirect purchaser rule, which bars not only the claims of indirect purchasers, but the claims of all indirect victims of any kind. *See Fiala v. B & B Enters.*, 738 F.3d 847, 851 (7th Cir. 2013). That hardly helps UHC's case. UHC's arguments boil down to the claim that because these decisions do not contain a sentence like, "We hereby adopt the IPR," they did not do so. That fallacy fails.

UHC also contends that the reasoning of the Supreme Court's RICO precedents does not call for incorporating the IPR into RICO doctrine. ECF 35, at 26–27. As UHC reads the cases, "[t]he Court did not state or even imply that any other principle of antitrust law should equally apply to RICO." *Id.* at 26. That is simply not correct. Over a series of cases, the Court has gone

out of its way to emphasize that because the RICO statute borrows particular language from the antitrust statutes, the RICO statute incorporates the doctrines associated with that language and its common law antecedents. *See Holmes*, 503 U.S. at 268. That includes the earliest expressions of the doctrine that evolved into both the distinctive proximate cause standard and the IPR. *See Hemi Grp.*, 559 U.S. at 10 (citing *S. Pac. Co.*, 245 U.S. at 533).

UHC also claims that "the Supreme Court in *Holmes* held that it is the nature of the injury, as distinct from the nature of the purchase, which determines whether a plaintiff may sue under RICO." ECF 35, at 29 (citing *Holmes*, 503 U.S. at 268–69). Nowhere does *Holmes* draw any distinction between "the nature of the injury" and "the nature of the purchase." The discussion of injury in the passage UHC cites is an explanation of the statutory proximate cause standard, not an account of the necessary and sufficient conditions for statutory standing. *See Holmes*, 503 U.S. at 268 (describing the applicable "notion of proximate cause" as "a demand for some direct relation between the injury asserted and the injurious conduct alleged").

Finally, UHC contends in passing that the policy grounds that support the adoption of the IPR in the antitrust context do not support the adoption of the IPR in the RICO context. ECF 35, at 26. UHC's undeveloped argument is unpersuasive. Bright-line rules like the IPR facilitate effective and efficient enforcement of the laws by streamlining litigation. *See Apple*, 139 S. Ct. at 1522. That is no less true in the RICO context than it is in the antitrust context. What's more, the same risks of duplicative and complex recoveries that militate against permitting indirect purchasers to bring antitrust claims counsel against permitting them to bring civil RICO claims. *See McCarthy*, 80 F.3d at 850–51. Because an indirect purchaser only pays more if another, more direct purchaser pays more, whenever the rule would apply, there are multiple parties in a position to bring comparable, intertwined claims. *See Indivior*, 2022 WL 17718342, at *3. No wonder other

courts have recognized that the policy concerns motivating the IPR apply to civil RICO claims. *See id.* (recognizing that "the same policy concerns apply to RICO cases") (citing *McCarthy*, 80 F.3d at 851).

Even if the policy arguments for the IPR do not apply as forcefully to RICO claims as they do to antitrust claims, that would not be enough for this Court to justify deviating from the reasoning of multiple Supreme Court decisions and breaking with the consensus of the lower federal courts. "[W]hile there may be reasons to carve out an exception to the indirect purchaser rule, or to conclude that it should not apply, such a decision is fraught with policy judgments that are more properly committed to the Court of Appeals rather than a single District Judge." *Humana*, 2023 WL 2743307, at *13; *see also Apple*, 139 S. Ct. at 1524 ("[T]he bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* apply with equal force in every individual case. We should not engage in an unwarranted and counterproductive exercise to litigate a series of exceptions.") (internal quotations omitted). This Court finds that the IPR bars indirect purchasers from bringing civil RICO claims.

UHC is an indirect purchaser of UT's drugs, not a direct purchaser. "'Indirect purchasers' are those purchasers '[i]n the distribution chain, [who] are not the immediate buyers'" from the defendant. *Kloth*, 444 F.3d at 320 (quoting *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990)). Nowhere does UHC allege that it purchased any UT drug directly from UT. To the contrary, according to the complaint, patients purchase UT's drugs from pharmacies, pharmacies purchase UT's drugs from UT, and UHC reimburses pharmacies for its insureds' purchases. ECF 1, ¶¶ 73, 152, 195. As the Third Circuit recently observed of a similar theory of injury, UHC's claim is thus "a textbook indirect-purchaser theory: They seek redress for injuries suffered because

their insureds purchased [UT PAH drugs] and [UHC] reimbursed those purchases." *See Indivior*, 2022 WL 17718342, at *3.[5]

The IPR applies to civil RICO claims. UHC is an indirect purchaser of UT's PAH drugs. Therefore, UHC does not have statutory standing to bring a civil RICO claim against UT predicated on its purchases of UT's PAH drugs. Because UHC cannot bring a substantive RICO claim, it cannot bring a RICO conspiracy claim. *See GE Inv.*, 247 F.3d at 551 n.2. These claims are subject to dismissal on this alternative ground as well.

### c. Proximate Cause

UHC's RICO claims also fall short for a distinct but related reason: failure to plead proximate cause. "A plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). "RICO establishes a private right of action for anyone 'injured in his business or property by reason of a violation of' RICO's criminal provisions. The phrase 'by reason of' requires a 'direct relation' between the plaintiff's injury and the defendant's RICO violation." *Albert v. Global Tel*Link*, 68 F.4th 906, 910–11 (4th Cir. 2023) (quoting 18 U.S.C. § 1964(c) and then *Holmes*, 503 U.S. at 268). The "direct relation" required for proximate cause "is lacking when (1) there is a 'more direct victim' from whom (or intervening factor from which) the plaintiff's injuries derive, or (2) the alleged RICO predicate violation is 'too distinct' or logically unrelated from the

---

[5] In a footnote, UHC insinuates that it can circumvent the IPR via its theory that UT unlawfully induced UHC to include UT's PAH drugs on its formulary by falsely certifying that UT was in compliance with federal law. *See* ECF 35, at 28 n.11; *see also Humana, Inc. v. Indivior, Inc.*, Nos. 21-2573 & 21-2574, 2022 WL 17718342, at *3 (3d Cir. Dec. 15, 2022). Even if UHC had pled that theory with the specificity required by Rule 9(b), it would not enable UHC to circumvent the IPR. By UHC's own account, adding UT's PAH drugs to its formulary only injured UHC when and because UHC had to reimburse pharmacies for filling the prescriptions of UHC insureds—in other words, because of its role as an indirect purchaser.

cause of the plaintiff's injury." *Id.* at 911 (citing *Saint Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 301 (3d Cir. 2020)). Under the "more direct victim" prong, "a plaintiff can't show RICO proximate cause when the plaintiff's injuries derive from those suffered by parties more closely or directly victimized by the defendant's wrongdoing. As the Sixth Circuit put it, these cases involve 'plaintiffs who suffer derivative or "passed-on" injuries.'" *Id.* (quoting *Trollinger*, 370 F.3d at 613).

*Slay's Restoration, LLC v. Wright National Flood Insurance Company* illustrates the problem facing UHC. 884 F.3d 489 (4th Cir. 2018). A subcontractor—Slay's Restoration—brought a civil RICO suit against an insurance company and claims adjusters to recover for underpayment for its work. *Id.* at 490–91. Slay's Restoration alleged that the defendants had reimbursed the owner of a flooded building too little for flood repairs on the basis of fraudulent representations that the work did not satisfy the applicable standards. *Id.* at 491–92. The building owner, in turn, underpaid the contractor, who then underpaid Slay's Restoration. *Id.* The Fourth Circuit held that Slay's Restoration had "not alleged facts showing that its injury"—the ultimate underpayment for its work—"was the direct result of the defendants' conduct." *Id.* at 494. The problem was simple: Between the defendants' unlawfully insufficient reimbursement and the plaintiff's underpayment stood other parties who passed the underpayment along. *Id.* The fact that the building owner mitigated its losses by paying less to the contractor, who in turn mitigated its losses by paying less to Slay's Restoration, did not change the fact that Slay's Restoration's injuries derived from the underpayment of the intervening parties. *Id.* Because Slay's Restoration thus alleged only derivative, indirect injuries, the subcontractor failed to plead proximate cause.

In much the same way, UHC pleads only derivative injuries. UHC never alleges that UT overcharged it for UT's PAH drugs. Instead, UHC alleges that UT overcharged pharmacies, who

in turn passed that increased cost along to patients and to UHC. Similarly, UHC never alleges that UT submitted any claims to it directly. Instead, UHC alleges that because of UT's scheme, more doctors prescribed UT's PAH drugs, more patients filled those prescriptions, and so pharmacies submitted more claims to UHC. On any account, UHC only paid more claims for UT's PAH drugs, at higher prices, because pharmacies bought more of UT's PAH drugs, at higher prices. At the end of the day, because UHC reimbursed the pharmacies and covered its beneficiaries' claims, only UHC was left with a loss. But the analogous argument did not salvage Slay's Restoration's claims, so it cannot salvage UHC's. UHC has failed to plead proximate cause. Other courts in comparable PAP-related RICO cases—including one against CVC—have found the same. *See Lundbeck*, 2023 WL 2637383, at *14–16; *CVC*, 2022 WL 3155035, at *10.

UHC insists that it has pled proximate cause because it has pled that "UT not only foresaw the injuries claimed by [UHC], UT intended to cause such injuries." ECF 35, at 23. "But this argument is nothing more than a claim that [UHC's] injury *foreseeably* resulted from [UT's] conduct, not that it *directly* resulted from that conduct." *See Slay's Restoration*, 884 F.3d at 494. As the Fourth Circuit has emphasized, "regardless of how foreseeable a plaintiff's claimed injury might be or even what motive underlaid the conduct that caused the harm, the injury for which a plaintiff may seek damages under RICO cannot be contingent on or derivative of harm suffered by a different party." *Id.* Binding Fourth Circuit precedent rejects UHC's response.

Because UHC has pled only injuries passed-on from pharmacies and patients, UHC has not pled proximate cause. Its civil RICO claims are subject to dismissal on this alternative ground as well.

### C.  Common Law Claims

Next are UHC's common law claims for fraudulent concealment, fraud, tortious interference with contract, aiding and abetting tortious conduct, and unjust enrichment. UHC does not identify the law under which it brings these claims. The answer, it turns out, is Minnesota. "Federal courts, when exercising their diversity or pendent jurisdiction over state law claims, must of course, apply the choice of law rules applicable in the forum state." *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 49 n. 11 (4th Cir. 1983) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941)).[6] "For tort claims, Maryland generally adheres to the *lex loci delicti commissi*, or place of harm, principle to determine the applicable state's substantive law." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) (citing *Hauch v. Connor*, 453 A.2d 1207, 1209–10 (Md. 1983)); *see also DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013). Under the place of harm principle, the Court applies the law of "the place where the injury was suffered, not where the wrongful act took place." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986). Typically, when a corporation alleges that it suffered injury in the form of economic loss, the place of injury is the place the corporation is headquartered. *See, e.g.*, *KeraLink Int'l, Inc. v. Stradis Healthcare, LLC*, No. CCB-18-2013, 2021 WL 4420636, at *6 (D. Md. Sept. 27, 2021). For UHC, that state is Minnesota. ECF 1, ¶ 9. So Minnesota law applies.

### a.  Fraudulent concealment

UHC claims that UT fraudulently concealed the prescription assistance scheme from the insurer. Under Minnesota law,

> to establish fraudulent nondisclosure, a plaintiff must establish that "a party conceal[ed] facts material to the transaction, and peculiarly within his own

---

[6] The Court has diversity jurisdiction over the state law claims.

> knowledge, knowing that the other party acts on the presumption that no such fact exists" and the "party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated with him."

*Reichel v. Wendland*, A23-0015, 2023 WL 5838837, at *5 (Minn. Ct. App. Sept. 11, 2023)

(quoting *Richfield Bank & Tr. Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976)). That duty to

disclose

> can arise in one of the following three circumstances: (1) where a party has made a representation and must disclose more information to prevent the representation from being misleading; (2) where a party has special knowledge of material facts to which the other party does not have access; and (3) where a party stands in a confidential or fiduciary relation to the other party.

*Exeter Bancorporation, Inc. v. Kemper Sec. Grp., Inc.*, 58 F.3d 1306, 1314 (8th Cir. 1995) (citing

*Richfield Bank*, 244 N.W.2d at 650). "[C]laims for fraudulent disclosure in Minnesota must be

pled with particularity and comply with the requirements of Federal Rule of Civil Procedure 9(b)."

*Zimmerschied v. JP Morgan Chase Bank, N.A.*, 49 F. Supp. 3d 583, 596 (D. Minn. 2014).

UHC contends that UT is liable for fraudulently concealing its scheme with CVC under

the "special knowledge" doctrine. ECF 35, at 41. UT argues that UHC has failed to plead that UT

had a duty to disclose the scheme. ECF 30-1, at 36. The legal standard UHC must meet to plead a

duty to disclose special knowledge is not perfectly clear. As even Minnesota courts have

acknowledged, "there is a sparsity of caselaw addressing the special-knowledge exception."

*Regents of the Univ. of Minn. v. Doran Univ. III, LLC*, A17-0277, 2017 WL 5985401, at *4 (Minn.

Ct. App. Dec. 4, 2017). Nevertheless, UHC has failed to plead that UT had a duty to disclose the

scheme.

Some courts have held that a duty to disclose special knowledge arises only between parties

to a relevant contract. As the Minnesota Court of Appeals once put it, "[t]he requirement to disclose

special knowledge has been held to apply when: (1) parties enter into a contract with each other;

(2) one party has superior knowledge not readily available to the other; and (3) that party is aware of the other's reliance on an erroneous belief." *Rossbach v. FBS Mortg. Corp.*, Nos. C3-97-1622, C9-97-1852, 1998 WL 156303, at *6 (Minn. Ct. App. Apr. 7, 1998) (citing *In re TMJ Implants Prod. Liab. Litig.*, 880 F. Supp. 1311, 1317 (D. Minn. 1995), *aff'd*, 113 F.3d 1484 (8th Cir. 1997)); *see also Qwest Commc'ns Co. v. Free Conferencing*, 990 F. Supp. 2d 953, 978 & 978 n.24 (D. Minn. 2014). If a contract is required, UHC has failed to state a claim. As the Court has discussed, although UHC has alleged the existence of a rebate agreement between the parties, UHC has failed to allege a number of significant facts about the agreement—including whether or how it related to the dispute at the heart of this case—leaving the allegation short of the requirements of Rule 9(b).

Even if a duty to disclose special knowledge can arise without a contractual relationship, Minnesota law appears to contemplate that such a duty arises only between one "party" to a "transaction" and another and covers only matters material to the transaction. *See*, *e.g.*, *Reichel*, 2023 WL 5838837, at *5 (quoting *Richfield Bank*, 244 N.W.2d at 650). As the Supreme Court of Minnesota put it in the first modern case on the doctrine, *Klein v. First Edina National Bank*: "As a general rule, *one party to a transaction* has no duty to disclose material facts *to the other*. . . . The main question for us is whether defendant's relationship to plaintiff was such as to impose on defendant a duty to inform plaintiff of all the details *of the transaction*." 196 N.W.2d 619, 622 (Minn. 1972) (emphasis added). UHC does not allege that it engaged in any transaction with UT giving rise to a duty to disclose special knowledge. UHC claims that it "did have the kind of business relationship that gives rise to the duty articulated in *Klein*" because "UT depended on payors such as [UHC] to pay for its drugs," despite the "fact that there were others in the chain between [UHC]'s payment and UT's profits." ECF 35, at 41–42. But UHC cites no Minnesota

case concluding that a relationship with *any* intermediaries—let alone *several*—gave rise to a duty to disclose special knowledge. UHC cites only *Neurontin*, a First Circuit case addressing a completely different issue—proximate causation. *Id.* at 42 (citing *Neurontin*, 712 F.3d at 37). UHC also suggests that UT's "regular contact" with UHC through its ASSIST program gave rise to a duty to disclose its knowledge of the scheme with CVC. *Id.* But the two cases UHC cites for that proposition do not support it: One concerned the relationship between the buyer of a part and the manufacturer, *Cannon Techs., Inc. v. Sensus Metering Sys., Inc.*, 734 F. Supp. 2d 753, 767–68 (D. Minn. 2010), and the other concerned the relationship between a bank and a customer seeking a loan, *Richfield*, 244 N.W.2d at 652. Those are formal business transactions—indeed, contractual ones—not mere exchanges of information.

No matter what the best way to formulate the standard is, UHC cites no case finding that a duty to disclose special knowledge arose from any relationship as attenuated as the one UHC allegedly had with UT. That defeats its claim. Because UHC has failed to plausibly allege a relationship with UT that would have subjected UT to a duty to disclose its special knowledge of the alleged scheme, UHC has failed to plead fraudulent concealment.

### b. Fraud

Next, UHC claims that UT committed common law fraud. The elements of a Minnesota law fraud claim are

> (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance.

*U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011). As a fraud claim, this count must be pled with the particularity Rule 9(b) requires. *See Zimmerschied*, 49 F. Supp. 3d at 591–92.

UHC's fraud claim fails to satisfy the heightened pleading requirements of Rule 9(b) for the same reasons that its RICO claim did. The claim rests on the same alleged misrepresentations, which suffer the same defects: the absence of key details like whom UT made these misrepresentations to, what precisely UT said and why it was false, when UT made these misrepresentations, and the like.

In briefing, UHC tries to provide the detail that its complaint does not. UHC may not amend its complaint through briefing. *See Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). Even if it could, the gaps would remain. UHC says that UT's SEC filings reveal that UT knew "that it only makes money if [UHC] and other insurers reimburse claims for its drugs" and that failure to comply with the AKS could jeopardize those reimbursements. ECF 35, at 39. That, however, is not the dispositive information missing from the complaint. The information in the SEC filings does not reveal when UT made the alleged misrepresentations, to whom, or what the misrepresentations said. UHC also directs the Court to a table it compiled, listing ten insureds whose cost-sharing obligations CVC allegedly covered, which drug the insured received, and the date the insured received the drug. ECF 35, at 40–41 (citing ECF 1-2, at 2). According to UHC's brief, "each of the claims submitted to [UHC] for the drugs prescribed to those members included a false certification that the claim complied with federal law." *Id.* But the exhibit itself says nothing about false certifications. Even if the Court could consider it, it would not suffice. *See Biogen*, 2023 WL 2743307, at *15 (comparable exhibit

failed to satisfy Rule 9(b)). It does not identify who made the false certifications, to whom, or how UT caused them to be made.

The best UHC offers is another publicly available document, a UT distribution agreement with a pharmacy, which said that UT would be "solely responsible for, and comply with, Applicable Laws." ECF 35, at 40. In its opposition, UHC asserts that "UT's misrepresentations to its own distributor were then transmitted to successive downstream entities—providers and pharmacies—that ultimately submitted claims to United that falsely certified compliance with the AKS." That sheds some light on the allegations. Yet once again, even if UHC could amend its complaint to include this previously omitted information, critical questions would remain unanswered: at the very least, whether this distribution agreement covered the UT PAH drugs at issue in this case; whether that pharmacy transmitted UT's assurance to UHC or made its own false assurance of compliance with federal law in reliance on UT's; and whether UHC knew of and relied on any false certification linked to this distribution agreement in its decisions to add UT's PAH drugs to its formulary or to cover individual claims for them.

Without that information, UHC's fraud claim cannot clear the high bar of Rule 9(b). So UHC's fraud claim is dismissed.

### c. Tortious interference with contract

UHC also claims that UT tortiously interfered with the contracts UHC had with its members. Under Minnesota law, the elements of a claim for tortious interference with contract are: "(1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach." *Metge v. Central Neighborhood Improvement Ass'n*, 649 N.W.2d 488, 500

(Minn. Ct. App. 2002) (citing *Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)).

UHC fails to plead that any beneficiary breached their contract with UHC. According to UHC, each UHC insurance contract obligates the insured to pay their copays. As UHC frames that duty in briefing, "[i]n order to ensure compliance with the AKS, the contracts also require that the members *themselves* pay their obligations, aside from limited exceptions not applicable here." ECF 35, at 35 (citing ECF 1, ¶ 80) (emphasis in original). As UHC sees it, each insured who paid their copay for a UT PAH drug with the help of CVC breached that obligation. The insured did not pay their copay—UT did. ECF 1, ¶ 82.

However, UHC's theory starts to fall apart quickly, particularly when juxtaposed with the sample contract the insurer provides. *See* ECF 1-1. An insured does not breach their contract *whenever* they make their copay with the help of a third party. *See id.* at 111 ("Send us information about the payments others have made for you. Payments made by certain other individuals and organizations also count toward your out-of-pocket costs."). And an insured does not breach their contract simply because they make their copay with the help of a PAP. *See id.* ("For example, payments made by a State Pharmaceutical Assistance Program, AIDS drug assistance program, the Indian Health Service, and most charities count toward your out-of-pocket costs."); *id.* at 31 (providing "[i]nformation about programs to help people pay for their prescription drugs"); *id.* at 109 ("Did you know there are programs to help people pay for their drugs? There are programs to help people with limited resources pay for their drugs.").

The question, then, is what provision of the contract insureds allegedly breached when they accepted assistance from CVC. UHC never answers. UHC points the Court to a provision that "states that when beneficiaries get their drugs through patient assistance programs offered by a

drug manufacturer, [UHC] 'will not pay for any share of these drug costs.'" ECF 1 ¶ 83 (quoting ECF 1-1, at 127). But UHC does not actually say that this is the provision its insureds breached—nor could it. For one thing, this provision governs only PAPs "offered by a drug manufacturer." ECF 1-1, at 127. Even taking UHC's factual allegations as true—as the Court does and must—the PAP at issue was offered by CVC, not by UT. Setting that aside, the provision covers a different scenario from the one UHC alleges constituted a breach of contract. UHC alleges its insureds breached their contracts when they received money from CVC to cover their copays, leaving UHC to reimburse the pharmacy for the rest of the cost. By contrast, this provision governs what happens when insureds receive a drug directly from the manufacturer's own PAP—bypassing UHC. This provision is announcing that in that scenario, UHC will not cover the insured's copay. The sample contract makes that clear: "Since you are not asking for payment" in that scenario, it is one of several "situations [that] are not considered coverage decisions" at all. *Id.* Finally, the provision is not a ban on insureds using PAPs or a penalty for doing so. It is merely an acknowledgment that if an insured supplements their coverage with assistance from a drug manufacturer, UHC will not provide additional assistance of its own by covering the copay.

UHC also argues that "the cost-sharing payments made by CVC would not count toward a beneficiary's out-of-pocket costs because those payments were actually made by UT and were not truly charitable." ECF 1, ¶ 82. But UHC does not even attempt to ground that assertion in any provision of the sample contract. That conclusory legal claim is no substitute for a plausible factual allegation.

The only other court to consider a tortious interference claim like this one dismissed it on the same ground. In *Humana Inc. v. Mallinckrodt ARD LLC*, another Medicare Part D insurance provider brought a similar panoply of RICO claims, state statutory claims, and common law claims

against a pharmaceutical manufacturer for a PAP scheme. CV 19-6926 DSF (MRWx), 2020 WL

5640553, at *1–2 (C.D. Cal. Aug. 14, 2020). Among other things, the insurer claimed that the

manufacturer tortiously interfered with the insurer's contracts with its beneficiaries by providing

unlawful copay assistance. *Id.* at *13–14. The insurer claimed that the unlawful assistance ran

afoul of contract terms requiring insureds to pay their own copays and providing "when you get a

drug through a patient assistance program offered by a drug manufacturer . . . we will not pay for

any share of these drug costs." *Id.* at *13. The court rejected that argument out of hand. *Id.*

"[N]othing in the cited provisions can reasonably be read as preventing members from paying their

co-pays with money obtained from a co-pay assistance fund." *Id.* The court explained:

> The first provision . . . merely requires members to pay their co-pays. It sets no
> limitations on the source of the funds. The second provision, when read in context,
> does not prohibit members from doing anything at all. It is only a reminder that if
> members obtain drugs outside of their plan benefits directly from the drug
> manufacturer through a patient assistance program, Plaintiff will not reimburse
> members for any payments made to the patient assistance programs. Here, in
> contrast, the members do obtain the drugs through their insurance, and simply
> obtain the funds to pay the co-pays through a co-pay assistance fund. That is not
> prohibited by the contracts.

*Id.* The same is true here.

UHC responds that *Mallinckrodt*'s interpretation would have the absurd result that "a

doctor could simply pay her patient the exact amount owed to cover her cost-share for a service

the doctor performed and that would comply with the contract"—an arrangement UHC reports

would violate the AKS. ECF 35, at 37. Nevertheless, whether a healthcare arrangement violates

the AKS is one thing; whether it violates a particular provision of a particular contract is another.

All the *Mallinckrodt* court found, and all this Court finds, is that allegations like these are

insufficient to plead a breach of contracts like those.

UHC fails to plead that any beneficiary breached their contract with UHC. UHC's claim for tortious interference with contract is dismissed.

### d. Unjust enrichment

In addition, UHC brings a claim against UT for unjust enrichment. Under Minnesota law, "[t]he elements of an unjust enrichment claim are: (1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it." *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195–96 (Minn. Ct. App. 2007) (citing *Acton Constr. Co. v. State*, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986))

UHC's unjust enrichment claim fails for two independently sufficient reasons. First, UHC fails to satisfy Rule 9(b). An unjust enrichment claim grounded in the same factual allegations as a fraud claim subject to Rule 9(b) is itself subject to Rule 9(b). *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827 (8th Cir. 2023). That is the case here: The unjust enrichment claim rests on the same factual allegations as the RICO claims and the claims for fraud and fraudulent concealment. Of course, as the Court has already explained with respect to each of these claims, UHC failed to plead those claims with the detail required to satisfy Rule 9(b). In consequence, UHC's unjust enrichment claim fails for the same reason.

Second, a party may not bring an equitable claim like unjust enrichment "where there is an adequate remedy at law available." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996) (citing *United States Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981)). If the plaintiff would have had an adequate remedy at law but for their failure to satisfy Rule 9(b), then they may not bring a claim for unjust enrichment. *Drobnak v. Andersen*, 561 F.3d 778, 786–87 (8th Cir. 2009) (citing *ServiceMaster of St. Cloud*,

544 N.W.2d at 306); *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 671 (D. Minn. 2021) ("[B]ecause the existence of an adequate legal remedy bars unjust enrichment recovery, such claims will be dismissed even if the claims giving rise to the legal remedy were inadequately pled."). Here, UHC's fraud claim failed solely because UHC did not plead it with the specificity required by Rule 9(b). Because UHC would have had that legal remedy available if it had pled it properly, UHC may not bring a claim for unjust enrichment.

For these two reasons, UHC's unjust enrichment claim is dismissed.

### e.   Aiding and abetting tortious conduct

Finally, UHC claims that UT aided and abetted the tortious conduct of CVC. A Minnesota claim for aiding and abetting tortious conduct has three elements: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).

UHC's claim against UT for aiding and abetting tortious conduct fails for lack of a plausible allegation that CVC committed a tort that injured UHC. In the corresponding count of the complaint, UHC does not allege that CVC committed any specific tort—much less plausibly allege that CVC did. Instead, UHC predicates its aiding and abetting claim on the success of its other tort claims against UT. CVC, UHC suggests, shares in UT's liability for those torts. ECF 35, at 38. Because those claims are dismissed, no potential predicate tort remains for the aiding and abetting count. In consequence, this claim is dismissed as well.

### D.  State Consumer Protection Statutes

Last, UHC claims that "UT's fraudulent and deceptive business practices" violated the statutes of a dozen different states. ECF 1, ¶ 250. The Court has dismissed two of those claims as barred by the applicable statutes of limitations. Ten remain. The problem for these 10 claims is that UHC does not even attempt to identify how UT's alleged actions violated each of these laws. Instead, UHC leaves UT—and the Court—to guess UHC's theory of the case. As another district court within the Fourth Circuit wrote in dismissing another grab bag of state statutory claims in another case involving CVC, the "Plaintiffs merely restate their RICO claims, couched in consumer protection terms, to match state consumer protection laws." *Lundbeck*, 2023 WL 2637383, at *17; *see also CVC*, 2022 WL 3155035, at *13. That is not enough to satisfy the heightened Rule 9(b) pleading standard that applies to allegations of "fraudulent" conduct like these.

What the U.S. Court of Appeals for the Second Circuit wrote about a similar antitrust complaint is instructive too:

> [The plaintiffs] purport to bring claims under myriad state consumer protection and unfair trade statutes arising out of the same anticompetitive allegations underlying the [federal] antitrust claims. The complaint does little more than list a couple dozen state statutes in alphabetical order by state, without pleading any of their elements. The pleading baldly asserts that the defendants' violations of those statutes proximately caused their injuries.
>
> [The plaintiffs'] briefing fails to explain adequately how the defendants' conduct violated any of the state consumer protection and unfair trade statutes in the conclusory list. [The plaintiffs] also fail to demonstrate why any of these claims should survive if the antitrust claims are dismissed. . . . Accordingly, [the plaintiffs'] state law claims were appropriately dismissed.

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016). Here, as there, the plaintiff has provided little more than an alphabetical list of state statutes it alleges the defendant violated by the same conduct that underlies the plaintiff's federal statutory claims. Here, as there,

the plaintiff has not pled any of the elements of these statutes or even explained in briefing how the defendant violated them. And here, as there, the plaintiff has not explained why its state statutory claims should survive dismissal when the federal claims predicated on the same allegations have not. So with the RICO claims dismissed and no basis in the complaint for distinguishing the conclusory state statutory claims, the Court dismisses the 10 remaining state statutory claims.

## IV.    Conclusion

For the reasons above, United Therapeutics Corporation's motion to dismiss, ECF 30, is granted. Counts I, III, V, VI, and the Michigan and Minnesota law claims of Count VIII are dismissed with prejudice because amendment would be futile.[7] *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (court need not provide opportunity to amend if amendment would be futile); *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 305 n.6 (4th Cir. 2017) ("[W]hen a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend.") (citation omitted). Counts II, IV, VII, and the other state statutory claims of Count VIII are dismissed without prejudice. A separate order follows.


Date: March 25, 2024

Deborah L. Boardman
United States District Judge

---

[7] The Court notes that although UT raised the statute of limitations issue in its motion to dismiss—over one year ago—and UHC opposed that argument as a matter of law, UHC has never claimed that it could amend the complaint to allege facts that would make its Michigan and Minnesota claims timely, much less sought leave to amend to do so.